UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

JOHN MLYNICK Pro Se
      Plaintiff

v.

TOWN OF ERVING, TOWN OF
SHELBURNE, ADAM PAICOS, individually
and as he is a sergeant with the Erving Police
Department, TUCKER JENKINS,
individually and as he is an officer with the
Shelburne Police Department,
ROBERT HOLST, individually and as he is
the Chief of Police in the Town of Erving,
GREGORY BARDWELL, individually and
as he is the Chief of Police in the Town of
Shelburne
      Defendants

CIVIL ACTION NO.

## COMPLAINT

### Brief Summary

This case involves and illegal, warrantless arrest on September 2, 2021, and the subsequent taking of the Plaintiff's property (A dog) by Erving Police Sergeant Adam Paicos, who then gave the dog to the complaining party, without warrant or due process, even though there was a binding legal contract between the plaintiff and the complaining party, which confirmed the complaining party had no legal right to the dog. Paicos did almost no independent investigation into the facts leading up to this arrest, and lied or, at the very least, demonstrated a reckless disregard for the truth in his police reports.

1

On December 16, 2018 the Plaintiff homed a dog he had bred with one Ashley Audet (hereinafter Audet) of Suffield, CT. As part of the homing process Audet signed a contract (The Homing Agreement) which stated as one of the conditions, that if she could not keep or care for the dog, she would return it to the Plaintiff. On August 3, 2021 at about 11:30 PM Audet surrendered and returned the dog to the Plaintiff as per terms of the contract. Audet had a domestic violence incident with her partner and so she was living in a hotel with her two children and could not care for the dog. Only at some point she changed her mind and stated she wanted the dog back. The Plaintiff refused because, among other things, he believed her home to be unstable. Audet called the police.

This Plaintiff asserts 42 USC 1983, 42 USC 1988, the Fourth Amendment, the Eight Amendment, and the Fourteenth Amendment rights guaranteed in the US Constitution, as well as the Articles XIV (14) and Article XXVI (26) of the Massachusetts Declaration of Rights, and Monell v. Department of Social Services., 436 U.S. 658 (1978) as the basis for this action.

This case also involves the defective and biased investigation into the facts leading up to Plaintiff's arrest by Shelburne Police Officer Tucker Jenkins who, along with ADA Erin Aiello, pronounced the contract between the Plaintiff and the complaining party did not mean what it clearly states, and took the word of the complaining party as fact, that Plaintiff had agreed to return dog to her, even though she offered no evidence to that fact. Jenkins lied, or at the very least, showed a reckless disregard for the truth in his police reports, and worked in tandem with Erving Sergeant Paicos right up to the time of arrest.

The Plaintiff has a 29 year history with Shelburne Police chief Gregory Bardwell, who supervised and approved further investigation after Jenkins pronounced in the police log that his investigation had ended with no issues for Shelburne. The charges levied against the Plaintiff were Felony Animal Cruelty (272/77/A), Larceny under $1200 by False Pretense (266/34/B),

and Receiving Stolen Property - Less Than $1200 (266/60/B).  These charges were dismissed on January 11, 2022, for lack of probable cause. The criminal court went further to state that possession of the dog was a civil matter, as the Plaintiff had maintained all along. Still, the Plaintiff suffered emotional distress for more than 5 months with the threat of never being able to own or work with dogs, because the police departments of Erving and Shelburne chose to ignore apparent facts, misreporting them, and even resorted to making up facts

*The Parties*

1.    The Plaintiff, John Mlynick (hereinafter Mlynick) is an individual residing at 30 Mystic Street, in Springfield, County of Hampden, in the Commonwealth of Massachusetts.  The Plaintiff also maintains a studio/office space and a kitchen space at Renovator's Supply at 1 River Street in Erving, County of Franklin, Massachusetts.

2.    The defendant Town of Erving is a municipality in the Commonwealth of Massachusetts with a usual place of business at 12 Main Street, Erving, in the County of Franklin, in the Commonwealth of Massachusetts (hereinafter Erving or Town), and at all times herein acted under the color of state law.

3.    The defendant Town of Shelburne is a municipality in the Commonwealth of Massachusetts with a usual place of business at 51 Bridge Street, Shelburne Falls, in the County of Franklin, in the Commonwealth of Massachusetts (hereinafter Shelburne), and at all times herein acted under the color of state law.

4.    The defendant Adam Paicos is named individually, and as he is a Police Sergeant in the Town of Erving (hereinafter Paicos) and at all times herein acted under the color of state law.

3

5.    The defendant Tucker Jenkins is named individually, and as he is a Police Officer in the Town of Shelburne (hereinafter Jenkins) and at all times herein acted under the color of state law.

6.    The defendant Robert Holst is named individually, and as he is the Police Chief in the Town of Erving (hereinafter Holst) and at all times herein acted under the color of state law.

7.    The defendant Gregory Bardwell is named individually, and as he is the Chief of Police in the Town of Shelburne (hereinafter Bardwell) and at all times herein acted under the color of state law.

*Jurisdiction and Venue*

8.    Jurisdiction is appropriate in this Court under 28 U.S.C. Section 1331 (federal question) and 42 U.S.C. Section 1983 (violation of civil rights).

9.    Venue is appropriate in this Court because the majority of the parties reside, or is domiciled, in the Western District of Massachusetts, and the events occurred in the Western District of Massachusetts.

*Facts*

10.    On December 16, 2018, Mlynick homed a male Border Collie puppy with Ashley Audet, who was at that time living Suffield, Connecticut. At that time Audet signed a contract (The Homing Agreement) which stated that is she was unable to keep or care for the dog, she must return the dog to the Mlynick.

11.    On August 3, 2021, at approximately 2330 hours, Audet exercised her contractual right to return the dog to Mlynick.

12.   Audet stated the she had a domestic violence incident with her then partner. She moved out of her home and was living in a hotel with her two young children and could not keep the dog.

13.   Audet stated she had to run for her life because her partner/boyfriend had threatened to kill her. She stated she had ran to her neighbor's house where she called the police.

14.   Mlynick took possession of the dog and noticed that the dog seemed over medicated. It was continually groggy and stumbled often, and looked dead in the eyes. There was no joy in the dog. The dog had had a seizure  four or five months earlier and was on phenyl barbital.

15.   The very next day Mlynick made an appointment with his veterinarian for an examination and evaluation.  As a result, and with the advice of the veterinarian, the dog's dosage of phenyl barbital was reduced.

16.   The dog also had very sharp claw nails, which indicated the dog stayed inside most of the time and got almost no exercise, so Mlynick began exercising the dog daily.

17.   The results were amazing. The dog came back to life and was tolerating the reduced medication very well, with absolutely no side effects.

18.   On or about August 8, 2021, Audet began to send text messages asking how the dog was and stating she could not wait to get the dog back when she found a place to live. Mlynick did not have that understanding, nor did he agree to return the dog to Audet. Audet had returned the dog per terms of the contract and now was saying something different.

19.   Mlynick was not in the dog sitting business, and as Audet had not offered to compensate him in any way, there was no agreement other than the contract which clearly stated what would happen should the dog be returned to Mlynick.

20. On August 25, 2021 Audet stated she wanted Mlynick to return the dog to her immediately. Mlynick refused citing the terms of the contract.

21. On August 25, 2021 at 1827 Audet first contacted Shelburne Control dispatch, she told the police dispatcher that she had asked defendant to watch the dog while she was on vacation. The dispatcher logged the entry.

22. Some three minutes later, at 1830 Shelburne Officer Jenkins contacted Audet and, according to Jenkins' police report, gave a different reason. Jenkins reported that Audet stated she was moving due to "romantic issues" and she had asked Mlynick to care for the dog temporarily.

23. About that time Jenkins reached out to Mlynick. Mlynick emailed Jenkins a copy of the signed contract.

24. The dispatch log also indicates that at 1830 Jenkins advised Audet to take Mlynick to civil court.

25. At 2143 the same day Jenkins logged that he "Determined no issues in Shelburne. Case to be given to MSPCA - 53-4 and Springfield PD." Mlynick does not live in Shelburne and does not spend time there, so this determination is appropriate.

26. The following day, August 26, 2021 at 1517 Jenkins logged that he initiated an investigation with ADA Erin Aiello and ACO Kyle Dragon.

27. No explanation is given as to why he is initiating an investigation on a civil contract dispute involving parties that do not live within his jurisdiction and do not spend time in his jurisdiction.

28. Shelburne Police procedure and policy states that officers must keep the chief of police or sergeant informed of their investigations.

29.  Jenkins, following policy, should have informed the chief or sergeant of his
     investigation into Mlynick.

30.  At 1540 hours, according to Jenkins' police report, he met with ADA Aiello and ACO
     Dragon where he told Aiello that Mlynick "seized" the dog from Audet.

31.  Aiello apparently stated that the contract does not allow Mlynick to seize the dog and
     hold the dog from Audet.

32.  Three explanations of how Mlynick came to possess the dog.

33.  There is no mention of any effort to reconcile the differing explanations.

34.  Audet had stated that she voluntarily turned the dog over to Mlynick, yet Jenkins
     comes up with a different explanation without any evidence of any kind.

35.  Jenkins fabricated facts that he used as evidence to have Mlynick arrested, violating
     his civil rights.

36.  At that meeting, Jenkins told Aiello that Mlynick was withholding medication from
     the dog.

37.  Mlynick had told Jenkins that he reduced the medication with the advice of his
     veterinarian. This fact is not reported.

38.  Jenkins hid exculpatory facts that did not fit with his narrative.

39.  At 1540 hours it is noted in Jenkins' report that Springfield Police spoke with
     "someone" at Mlynick's residence who confirmed that Mlynick lived there with his
     dogs.

40.  At 1540 hours Jenkins noted that he contacted Leverett Police to interview Mlynick's
     dog sitter, Dr. Donald Robinson.

41.  Robinson stated that he had known Mlynick for years and provided praise for his
     level of devotion to dogs.

42. He stated that Klaus (The dog) appeared fine and stated he was told by Mlynick that he took the dog back on Audet's request as he had to get the dog from Ms. Audet in the middle of the night in the beginning of August at a hotel due to a domestic issue with her boyfriend.

43. Robinson's account is consistent with what Mlynick told Jenkins.

44. At 1645 Jenkins reported in the log that he met with ADA Aiello and ACO Dragon in regards to obtaining a warrant or charges.

45. Jenkins should have been well aware that a warrant involves swearing an oath or affirmation in front of a judge or magistrate attesting to the facts of the case.

46. No warrant was ever sought or mentioned after that entry, even though there was ample time to obtain a warrant in a nine investigation.

47. At 1645, over an hour after receiving confirmation from Springfield PD that Mlynick lives in Springfield, Jenkins reported in the log that he was unable to determine where Mlynick lives.

48. At 1944 hours Jenkins' states in his report that Mlynick was irate. This is true. Mlynick was angry that Jenkins was harassing, intimidating and threatening him in what was clearly a civil matter.

49. Mlynick was unaware at the time that Jenkins had altered Audet's story to indicate he had seized the dog, and that he had withheld medication arbitrarily.

50. Jenkins threatened Mlynick with arrest for animal cruelty and he reported that Mlynick stated, "Fuck you, get the fuck out of here."

51. Jenkins left out of his report that which does not fit the narrative he was putting forth to ADA Aiello and others.

52.    When Mlynick was threatened with arrest for animal cruelty for withholding medication he actually stated, "Fuck you, get the fuck out of here, I took him to my vet!" That was the third time Jenkins had information that the reduction of the dog's medication was supervised by Mlynick's veterinarian.

53.    The first two times were Mlynick's priorvstatements to Jenkins and Audet's text message evidence she had sent to Jenkins where Mlynick stated he had sought veterinary advice. None of this evidence was reported by Jenkins in the log or in his reports.

54.    Jenkins stayed directly involved with this case up to and including assisting with Mlynick's arrest.

55.    On September 2, 2021 shortly before Mlynick's arrest, Jenkins contacted Mlynick's dog sitter, Dr. Robinson, to determine where the dog was located. Robinson told him he was in Vermont on holiday. He gave that information to Erving Police Sergeant Adam Paicos.

56.    Sergeant Paicos arrested Mlynick on September 2, 2021 at 1907 hours in Erving.

57.    Paicos laid in wait on Gunn Street in Erving. As Mlynick passed by on his way to exercise his dogs, Paicos followed him for about 3/4 mile and stopped him on busy Route 63.

58.    Paicos stated the he wanted to talk with Mlynick and asked him to get out of the car. Mlynick asked Paicos if he had received the letter he sent a day or so prior. Paicos stated he had, but he just wanted to talk.

59.    Mlynick said he had nothing to say and it was at that point Paicos stated he was placing Mlynick under arrest for Larceny under $1200, Receiving Stolen Property, and Animal Cruelty. Mlynick was handcuffed and placed in Paicos' cruiser.

60.    Erving ACO Johnson arrived shortly after Mlynick's arrest to impound the four dogs Mlynick had in his car.

61.    Johnson let one of Mlynick's dogs escape and was overwhelmed because he could not catch the dog. The dog was distressed, running around in and out of traffic and traffic lanes on Route 63.

62.    Paicos and an officer from neighboring Northfield stood there observing and did nothing for some 5 minutes. This caused Mlynick great distress. In the cruiser Mlynick stamped his feet to get Paicos attention and screamed multiple times as loud as he could, "I'll help you!" "Please don't kill my dog!" Paicos looked momentarily at Mlynick and resumed his doing nothing but stand there. After about what seemed to be 5 minutes, Paicos and the other officer began directing traffic around the obviously distressed dog. By not acting immediately to help ACO Johnson corral the dog, and ignoring Mlynick's please to help them with the dog, Paicos and the Northfield officer endangered the life of the dog.

63.    In his report Paicos states he made one phone call to Audet. He states her statements were consistent with what she offered to Shelburne Police, ignoring the fact that Audet's statement to Shelburne Police had a number of inconsistencies.

64.    No details of what was discussed on Paicos' call to Audet are mentioned.

65.    Paicos' police report reveals no independent investigation and relies solely on information provided by Shelburne Officer Jenkins' information, which was factually incorrect and included fabricated facts.

66.    Paicos states in his report that Mlynick lives in the Renovator's Supply building (hereinafter Renovators), which he states is a storage facility and machine shop that is know to house residents illegally.

67. Paicos goes on to state that Erving Police is familiar with Mlynick and know him to reside there.

68. Mlynick rents office, music studio, and kitchenette space at Renovators Supply.

69. Mlynick paid rent totaling $11,460 per year for office, studio, kitchenette and storage space at Renovators..

70. The lease agreement forbade using the space for residential purposes.

71. Mlynick has been accused by Erving Police of living in the Renovator's Supply building three times since 2018.

72. The first time was August 29, 2018, the result of an illegal raid with police officers and health department personnel entering Mlynick's studios without a valid warrant and pronouncing that he lived there because he had a couch and a microwave.

73. Christopher Blair (hereinafter Blair), who was the Erving Chief of Police at that time condemned the studio until such time as the couch and microwave were removed.

74. Mlynick took Blair to his residence, which was 28 Taylor Hill Rd in Montague. Blair announced while in the kitchen of Mlynick's residence that Mlynick doesn't live here, because he did see any family pictures.

75. Later that day when Mlynick's landlord arrives the police station to attest to Mlynick's residency, Blair stated, "I don't believe you."

76. This undue attention and pressure by Erving Police Chief Blair on Mlynick's landlord caused stress that eventually lead to Mlynick moving his residence.

77. The second time Mlynick was accused of living at Renovators Supply was January 3, 2020.

78. A disgruntled former Renovators tenant reported that one of Mlynick's dogs had bitten him in October of 2019, more than two month earlier. The dog in question was

not a dog at all, but a puppy who was 4 months old at the time of the supposed bite incident.

79.    Mlynick had told the "alleged bite victim", Matt Goulet, (hereinafter Goulet) that he did not believe his injury looked like a dog bite, but told him to seek medical attention, and if the doctor believes the injury to be consistent with a dog bite, Mlynick would cover the medical expenses.

80.    Goulet did not seek medical attention, and over two months later he reported the incident to police and stated that Mlynick lived at Renovators Supply.

81.    Goulet had never once set foot in any of Mlynick's office/studios and so could not offer objective evidence. Erving Police Officer James Loynd(hereinafter Loynd) believed Goulet and demanded proof of residency of Mlynick.

82.    Mlynick's landlord sent Loynd an email attesting to his residency in Wendell. Loynd responded with a threat to take the landlord in for a deposition under oath.

83.    Loynd visited Mlynick's residence to confirm he lived there and stated to Mlynick that he did not see enough dog tracks in the snow, and so he did not believe Mlynick lived where he stated he lived.

84.    Erving ACO Johnson, who was also present, gave Mlynick a ticket for an unlicensed dog, which Mlynick contested.

85.    At that point the dog in question had turned 6 month old just a few weeks earlier. The Erving dog ordinance gives a dog owner 30 days to license a dog after turning 6 months old.  The dog was born on June 6th of the past year, and still had days to go before being in violation of the statute.

86.    Erving Police had pressured and intimidated another of Mlynick's landlords leading to stress, with the direct result of Mlynick being asked to leave a couple months later.

87. This was a developed pattern of harassment by Erving PD. Unless Mlynick told them what they wanted to be true, even if false, they would threaten to arrest him or take other legal actions.

88. Mlynick chose at that time to stop talking with Erving Police.

89. The third time Mlynick was accused of residing at Renovators is clearly in Paicos police report, *"It is believed that MLYNICK is residing at Renovator's supply. It should be noted that Renovator's Supply is not a dwelling. It is a warehouse containing storage units. There are no units with plumbing of running water. It is not adequate to be housing animals, nor are animals allowed by the owner of the building to reside there."*

90. Erving Police, Erving Health Department, and the Eastern Franklin County Health District all have pictures of Mlynick's office/studio and kitchenette spaces, due to an inspection performed in June or July of 2020.

91. Those pictures clearly show a sink which happens to have hot and cold running water, and a office/studio, both of which have heat, air conditioning, electric lighting sufficient for a office/studio, and internet. Mlynick's spaces are clearly not storage spaces.

92. Mlynick's dogs were welcomed at Renovators, and even celebrated by staff and many of the other tenants.

93. Paicos included prejudicial and factually incorrect information (paragraph 89) in his report, and offers no supporting evidence.  They are false statements that absolutely every town employee knows, yet to a man, they continue to represent as true. That is no excuse for Paicos to offer information he knows to be false in a police report.

13

94.   Based upon the false information and allegations, as well as the fabricated evidence, bail was set for Mlynick at $2500 cash, which was and is excessive, given that the crux of this matter is a contract dispute. About the same time, August 29, 2021, a mangas arrested in Revere for Cruelty to Animals. He had tied a dog below the high water mark at a beach there intending to kill the dog. His bail was set at $340 according to the Revere Journal. Setting excessive bail is a violation of Mlynick's Eighth Amendment Rights and Massachusetts Declaration of Rights Article 26.

95.   After taking Mlynick into custody, Paicos contacted Audet and turned over the dog, Klaus, to her. He did so without due process of a hearing to determine which party had the valid claim on the dog. Paicos simply took the dog from Mlynick and gave it to Audet.

96.   Paicos, Jenkins, and ADA Aiello all pronounced that the contract did not mean what it clearly states. Paicos, Jenkins, and Aiello all acted under color of state law. In the end they were all wrong, yet Mlynick has yet to receive the dog returned to him.

97.   Contracts are interpreted, validated, or invalidated by judges after considering all the circumstances, not on a whim by police officers or ADAs. Mlynick can find no statute that gives police or ADAs the power to interpret or validate contracts.

98.   Paicos, Jenkins, and ADA Aiello did exactly what they accused Mlynick of: Seizing the dog forcefully from his owner (Mlynick) under color of state law, with no intention of returning the dog, then giving it to Audet. This is a violation of Mlynick's Fourth and Fourteenth Amendment Rights.

99.   It should be noted that Mlynick has since moved out of Renovators, because of the ongoing harassment by Erving Police.

100. Mlynick and Shelburne Chief of Police, Gregory Bardwell, have a load 29 year history. In that time Mlynick has driven Bardwell's elementary school bus, he worked as an instructional aide at Mohawk Trail Regional High School when Bardwell attended.

101. When Mlynick drove Bardwell's school bus in elementary school, Bardwell always seemed aloof, whereas the other students would converse with Mlynick, Bardwell never did.

102. Mlynick loved to laugh with the students and believed that elementary students, much like dogs, are unspoiled by the lessons and hardships of life. They are innocent. Mlynick enjoyed the students very much.

103. A couple of parents saw this as unacceptable and enlisted a number of students to write letters to the police and school accusing Mlynick of drinking on the job and inappropriate touching amongst other things.

104. One day in 1996 or 1997, then Buckland Chief of Police Jim Hicks informed Mlynick of the letter writing effort to get him fired.

105. Mlynick was allowed to read the letters written by the students, there were seven of them.

106. Letters were written by Caitlyn Miner, Larrisa Miner Ethan Kendrick, Gregory Bardwell, and a few others. The now Chief of Police Gregory Bardwell wrote one of those letters.

107. Absolutely all of the allegations made in those letters were debunked by the other students on the bus. However, the parents that organized the letter writing continued with their campaign to get Mlynick fired and he chose to resolve the issue by taking another bus route.

108. When Mlynick worked as an instructional aide at Mohawk Trail Regional High School, his duties were running study halls and patrolling the hallways. In the hallways there was always a bunch of boys who would congregate in the halls during periods, apparently to take a break from class. More often than not, Bardwell was one of the students in the hallway.

109. Mlynick's position was that he was not there to get the students into trouble, he was there to get them back to class. He did this by simply showing up and saying something like "Get to class."

110. Mlynick cannot remember sending even one loafing student to the office for discipline, but it was impressed upon him that Bardwell did not like being shooed to class.

111. Mlynick was a sort of resource officer before there were resource officers, the school cop, so to speak.

112. In Mlynick's performance review it was noted that Mlynick was extremely efficient at his job, and the one thing mentioned that could be improved upon was his efficiency, he could benefit by being a bit less efficient.

113. Throughout the entire time Mlynick knew Bardwell, Greg never once smiled at him or spoke with him.

114. On August 13, 2007 shortly after Bardwell joined the Shelburne Police Department, Bardwell was running radar on Route 112, under the Route 2 bridge. Mlynick had turned off of Hope Street onto Route 112  and a short 400-500 feet down the road he was stopped by officer Bardwell.  Bardwell said Mlynick was speeding, 42 in a 30 MPH zone. The speed limit where Bardwell had clocked Mlynick was 35 MPH and

Mlynick had only travel 400-500 feet down the road before encountering Bardwell's radar.

115.    Bardwell approached Mlynick's car grinning widely and never stopped grinning the entire traffic stop. Bardwell gave Mlynick a written warning, which most certainly went on his driving record.

116.    Mlynick, being concerned at the harassing nature of the traffic stop telephoned then Shelburne Selectman Joseph Judd and expressed displeasure at the manner in which he was stopped. Bardwell enjoyed that stop too much and seemed to be sending a message to Mlynick that Bardwell that he is the law now.

117.    Mlynick never once singled Bardwell out or embarrassed him in front of his fellow students, yet Bardwell held a grudge, and apparently still, to this day, holds a grudge. The reason for the grudge is beyond Mlynick's comprehension. That is not someone who deserves to be a police officer, much less chief of police.

118.    Bardwell had to approve of Jenkin's continued investigation from the second day (8/26/21) forward, as Jenkins had essentially closed the investigation on day one (8/25/21).

119.    Neither party lived or spent any time in Shelburne, and yet a vigorous investigation ensued, Jenkin's time paid by the Town of Shelburne, with no benefit to the town or it's people.

120.    Jenkins instigated a manhunt and coordinated with no less than six police departments, for a contract dispute. Yet Jenkins never had trouble contacting Plaintiff whenever he wished.

121.    Jenkins had a vested interest in the outcome, because Bardwell, his chief, had an interest in the outcome.

122.  Erving Chief of Police Robert Holst, continued former chief Blair's and the Town of Erving's campaign of harassment against Renovators' Supply, Inc, and Mlynick as evidenced by Paicos insistence that Mlynick resided at Renovators and the disinformation, and false statements in his report.

123.  Chief Bardwell and Chief Holst, were the final decision-making officials in their departments and were responsible for their respective departments and actions taken by their departments at their direction, at the time those decisions and actions were taken.

124.  Chief Bardwell and Chief Holst acted under color of state law at all times relevant to this case.

## COUNT I
## (VIOLATION OF 42 USC SECTION 1983 BASED UPON FALSE ARREST AND FALSE IMPRISONMENT IN VIOLATION OF FOURTH AMENDMENT RIGHTS)

125.  The Fourth Amendment provides: "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"

126.  The false arrest, actions described above, and failure Erving and/or Shelburne Police to obtain a warrant for arrest, when there was ample time provided by a nine day the investigation and, as there was no probable cause for the arrest, is a violation of Mlynick's Fourth Amendment Rights.

127.  42 U.S.C. Section 1983 provides in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…, subjects, or causes to

be subjected, any citizen of the United States… to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

128.    The Town of Erving, and the Town of Shelburne, as well as each individual defendant, qualifies as a person under 42 U.S.C. Section 1983.

129.    The Town of Erving and the Town of Shelburne, as well as each individual defendant, acted under the color of state law in their faulty investigation leading to Mlynick's arrest without probable cause within the meaning of 42 U.S.C. Section 1983.

130.    The Town of Erving and the Town of Shelburne, as well as each individual defendant acted under color state law in executing the investigation leading to Mlynick's arrest.

131.    None of the defendants are entitled to any qualified privilege for their actions described above.

132.    The conduct by the defendants described above deprived the Plaintiff of rights and privileges secured under the Constitution of the United States (to be free from unreasonable searches and seizures) within the meaning of 42 U.S.C. Section 1983.

133.    The Plaintiff suffered damages as a result of the acts of the defendants described above.

134.    The unconstitutional arrest on September 2, 2021, the extraterritorial, extra jurisdictional investigation, fabricated evidence, false statements, and withholding of exculpatory evidence leading to that arrest constituted a policy of the Town of Shelburne, because it was approved and directed by the highest ranking officials of the Town of Shelburne, including, but not limited to, the Chief of Police.

19

135. The unconstitutional arrest on September 2, 2021, the extraterritorial, extra jurisdictional investigation, fabricated evidence, false statements, and withholding of exculpatory evidence leading to that arrest constituted a policy of the Town of Erving, because it was approved and directed by the highest ranking officials of the Town of Erving, including, but not limited to, the Chief of Police.

136. The municipal defendants are liable due to their failure to properly train the individual defendants.

COUNT II
(VIOLATION OF ARTICLE 14 OF THE MASSACHUSETTS DECLARATION OF RIGHTS AND FOURTEENTH AMENDMENT BASED ON SEIZURE OF DOG WITHOUT WARRANT AND WITHOUT DUE PROCESS)

137. The Plaintiff repeats and reasserts the allegations contained in paragraphs 1- 136 inclusive, and incorporate them by reference as if fully and completely set forth herein.

138.  Article XIV of the Massachusetts Declaration of Rights provides in part: "Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws."

139.  The actions of the defendants described above violated the rights of the Plaintiff under Article XIV of the Massachusetts Declaration of Rights and the Fourteenth Amendment.

## COUNT III
### (VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT)

140.  The Plaintiffs repeat and reassert the allegations contained in paragraphs 1- 139 inclusive, and incorporate them by reference as if fully and completely set forth herein.

141.  As set forth above, the actions of the defendants not only violated the Fourth Amendment of Constitution and Article 14 of the Massachusetts Declaration of Rights, but were designed to, and did, threaten and intimidate the Plaintiff within the meaning of the Massachusetts Civil Rights Statute G.L.c. 12, Section 11H.

## COUNT IV
### (INVASION OF PRIVACY)
#### G.L.c. 214 Section 1B

142.  The Plaintiffs repeat and reassert the allegations contained in paragraphs 1- 141 inclusive, and incorporate them by reference as if fully and completely set forth herein.

143.  G.L.c. 214, Section 1B provides in part: "A person shall have a right against unreasonable, substantial or serious interference with his privacy."

144.  The actions of the defendants described above unreasonably, substantially and seriously interfered with the privacy rights of Plaintiff within the meaning of G.L.c. 214, Section 1B.

COUNT V
(INTERFERENCE WITH ADVANTAGEOUS CONTRACTUAL RELATIONS)

145. The Plaintiff repeats and reasserts the allegations contained in paragraphs 1- 144 inclusive, and incorporates them by reference as if fully and completely set forth herein.

146. The actions of the defendants described above improperly interfered with Plaintiff's advantageous relationships with his Border Collie Community.

147. The actions of the defendants described above resulted in Plaintiff defaulting in his contractual obligations.

COUNT VI
ABUSE OF PROCESS

148. The Plaintiff repeats and reasserts the allegations contained in paragraphs 1-147 inclusive, and incorporate them by reference as if fully and completely set forth herein.

149. The acts of the defendants described above, including, but not limited to, unconstitutionally seizing Plaintiff's property, the dog, and giving property to Audet, without warrant and without due process, constituted an abuse of process.

150. The acts of defendants described above, including, but not limited to, falsification of evidence, fabrication of evidence, knowingly providing false evidence in a police report with a reckless disregard for the truth, constituted an abuse of process.

151. The acts of defendants described above, including, but not limited to, threatening and intimidating Plaintiff, insisting he bear false witness against himself, to further goals of the town, instead of the goals of justice, constituted an abuse of process.

COUNT VII
(DEFAMATION)

152.    The Plaintiff repeats and reasserts the allegations contained in paragraphs 1- 151 inclusive, and incorporate them by reference as if fully and completely set forth herein.

153.    The defendants actions described above defamed the Plaintiff holding him up to ridicule among the community, Plaintiff's friends, Plaintiff's Border Collie Community, and Plaintiff's veterinarian.

COUNT VIII
(IMPROPER TAKING OF PROPERTY WITHOUT DUE PROCESS)

154.    The Plaintiff repeats and reasserts the allegations contained in paragraphs 1- 153 inclusive, and incorporates them by reference as if fully and completely set forth herein.

155.    The defendant's actions in seizing the Plaintiff's property and giving said property to Audet, without warrant and without due process, is improper and constitutes a violation of Plaintiff's Fourth Amendment and Fourteenth Amendment rights, as well as the Massachusetts Declaration of Rights, Article XIV.

156.    The Fifth Amendment precludes taking private property for public use without just compensation.

COUNT IX
(INFLICTION OF EMOTIONAL DISTRESS)

157.    The Plaintiff repeats and reasserts the allegations contained in paragraphs 1- 156 inclusive, and incorporates them by reference as if fully and completely set forth herein.

158.    The defendants harassed, intimidated, and threatened Plaintiff for over nine days, resulting in arrest for Felony Animal Abuse, a charge that would preclude Plaintiff from continuing to keep and care for his beloved Border Collies, causing Plaintiff great distress.

159.    Defendant Paicos stood there as one of Plaintiff's dogs, suffering distress from the strange situation that presented itself during Plaintiff's arrest, darted about, in and out of the busy roadway. The Plaintiff was screaming to help the situation and save his dog from being killed by a passing vehicle, yet Paicos ignored him and stood there talking to an officer from the neighboring town. This caused Plaintiff extreme distress.

160.    Defendant Paicos seized Plaintiff's dog, Klaus, and gave it to Audet. That dog was and is Plaintiff's responsibility.  Audet who is a drug addict, later sold the dog. The Plaintiff suffers ongoing distress because he does not know where the dog is or if the dog is healthy and happy.

161.    Upon reading the police reports from Paicos and Jenkins, and recognizing the false, misleading, and even fabricated evidence, as well as prejudicial statements, caused Plaintiff extreme distress.


### PLAINTIFF'S STATEMENT REGARDING DEFENDANT'S MEANS AND METHODS

Defendant Jenkins lied and fabricated evidence, and suppressed exculpatory evidence in a quest to return dog to a woman who contractually surrendered the animal, thereby turning civil matter into a criminal matter.

Defendant Paicos offered false evidence and a prejudicial narrative in an effort to once again, intimidate and harass the Plaintiff, as had been Erving Police policy for years.

Former Erving Police Chief Blair pressed for years to intimidate and harass Plaintiff to admit he resides at Renovators, even in the face of contrary evidence. This full court press became Town of Erving policy

Defendant Holst continued Blair's and Town of Erving's policies when he assumed the position of Chief of Police.

Defendant Bardwell, holding grudge since childhood, instructed his subordinate to pursue Plaintiff, possibly encouraging or ordering him to lie and fabricate evidence.

It was a perfect storm of two police departments and two towns, with an agenda other than justice, using their combined police powers under color of state law to harass, intimidate, threaten, and ultimately arrest and imprison the Plaintiff, seizing his personal property in the process, and giving it to another party. Their goals had nothing to do with justice and everything to do with teaching the Plaintiff a lesson. They ultimately failed, as they had no probable cause for any of their actions, but they caused the Plaintiff great injury, frankly, injury that entrusted civil officers and servants should never cause. Their actions were excessive at every turn, and all showed a reckless disregard for the truth, an indictment that should preclude them all from holding their trusted positions. If they cannot be trusted to tell the truth, the whole truth, they cannot be trusted to protect and serve justice.

There is no penalty too great for these defendant's transgressions. Any award for damages should be greater than the liability limits on each town's and each defendant's insurance, to insure the pain they suffer is severe enough that they will think twice before engaging in such a dishonest endeavor ever again. They caused Plaintiff great distress, and great injury and deserve a harsh penalty. Justice is not served by these police officer defendants, nor by the towns that do not charge them with serving justice.

**WHEREFORE** the Plaintiff respectfully request that this Court:

a.    Enter a Judgment against each defendant in favor of Plaintiff in an amount to be determined by this Court, together with interest, costs and attorneys fees pursuant to, among other statutes and law, 42 U.S.C. 1983 and 1988 and G.L.c. 12, Section 11H;

b.    such other relief as this Court deems fair and just.

### JURY TRIAL DEMAND
Plaintiff demands a trial by jury on all claims so triable.

Respectfully Submitted,

/s/ John Mlynick
John Mlynick ProSe
30 Mystic Street
Springfield, MA 01104
413-325-1299
jmlynick@gmail.com